Argued and submitted July 10, 1989, affirmed April 4, 1990

## OREGON BANK,
*Appellant,*

*v.*

## FUHRMAN DEVELOPMENT COMPANY et al,
*Defendants,*

## KILKENNY et al,
*Respondents.*

(6629; CA A44325)

790 P2d 544

W. Eugene Hallman, Pendleton, argued the cause for appellant. With him on the briefs were Mautz Hallman and Robert T. Mautz, Pendleton.

David P. Roy, Portland, argued the cause for respondents. With him on the brief were Susan J. Widder and Rappleyea, Beck, Helterline & Roskie, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

**BUTTLER, P. J.**

The Oregon Bank (Bank) appeals from a judgment entered for Kilkenny and Kane (defendants) in this action to collect a deficiency judgment after a real estate foreclosure.[1] Bank alleges that defendants guaranteed payment of the loan that the foreclosed property secured. It assigns error to many of the trial court's findings and to its holding that certain documents do not impose any obligation on defendants to pay Bank the deficiency. Because the court's findings are supported by the evidence and, because we agree with the court's interpretation of the documents, we affirm.

In 1976, Bank loaned $1,600,000 to Fuhrman Development Company (FDC) and Columbia Pacific Resources, Inc., to finance the Boardman Project, a community development. As security for the loan, FDC gave Bank a mortgage on the Boardman Project property. In 1977, defendants and Rolph Fuhrman, a principal of FDC, became involved in the Makena Surf Project, a condominium development in Hawaii. Bank provided a portion of the financing to Fuhrman. The loan agreement contained a "cross-default" provision that provided that, if Fuhrman were to default on any other obligation to Bank, the Makena Project loan would also be deemed to be in default.

The Boardman loan went into default in July, 1978. Bank did not, however, declare a default in the Makena Project loan. In August, 1979, Bank agreed to modify the Boardman loan by, among other changes, eliminating the default, reducing the interest rate and extending the time for payment. It claims that it agreed to the modification largely in reliance on financial commitments from defendants, as evidenced by the events that took place and documents that came into existence after July, 1978.

From July, 1978, to December 1, 1978, FDC, through Fuhrman, had conversations with Fletcher, Bank's loan officer, regarding the possibility of bringing defendants' financial strength into the Boardman Project. On December 1, 1978, Bank advised Fuhrman that, if the loans were not

---

[1] A final judgment disposes of all the claims of all the parties.

brought current by December 15, 1978, "it will be necessary for us to take appropriate action to protect our interests."

In the meantime, defendants and Fuhrman negotiated concerning their various business dealings. Defendants were interested in curing the default by Fuhrman on the Boardman Project in order to avoid Bank's implementation of the cross-default provision on the Makena loan. On December 11, 1978, Fuhrman, individually and as chairman of FDC, wrote a letter to defendants that stated, in part:

> "[A]ll of the Fuhrman right, title and interest in and to the Boardman Property, as herein defined, is conveyed and assigned to each of you such that William H. Kilkenny, Harry J. Kane and Rolph B. Fuhrman will each claim an equal one-third interest in the Boardman Property. It is understood that Charles Fuhrman and I will make whatever assignments and conveyances, including assignments of stock, as are necessary to evidence the foregoing property division."

In addition, the letter recited, that

> "whatever portion of the Oregon Bank Mortgage shall ultimately be the responsibility of Fuhrman Development and/or me or other Fuhrman interests shall be assumed equally among the three of us, i.e., William H. Kilkenny shall assume and pay one-third, Harry J. Kane shall assume and pay one-third and Rolph B. Fuhrman shall assume and pay one-third * * *."

Defendants signed the letter, indicating their agreement. Bank contends that Fuhrman and defendants executed that document with the intention of protecting the Makena Project from the cross-default provision by giving defendants' financial backing to the Boardman loan. It contends that, in modifying the Boardman loan agreement in August, 1979, it was aware of the substance of the letter of December 11, 1978, and relied on it, and that all subsequent events and documents must be viewed in the light of that letter. The trial court found that Fletcher, Bank's loan officer, had no knowledge of the December 11, 1978, agreement until after the start of this litigation and that Bank did not rely on it in deferring legal action or in ultimately modifying the Boardman loan agreement. That finding is supported by the evidence. The trial court also found that, in any event, the December 11, 1978, agreement was never effectuated. That finding is also supported by the evidence.

Alternatively, Bank contends that, in view of the December 11, 1978, letter expressing defendants' intention to be obligated on the Boardman loan, defendants guaranteed or became obligated to Bank on that loan as the assignee of later financial commitments made by them to FDC. The obligations allegedly arose out of discussions between Fletcher, Fuhrman and defendants, which are evidenced by several documents.

On July 31, 1979, Fuhrman, defendants and their lawyer, Spencer, met with Fletcher to discuss the Boardman loan. The evidence supports the trial court's finding that, at that meeting, Bank did not request that defendants guarantee the Boardman loan and that defendants informed Bank that they would not, under any circumstance, become obligated to Bank for Fuhrman's indebtedness.

On August 13, 1979, Spencer wrote a letter to Putnam, Bank's attorney, stating, in part:

> "As I understand it, you will prepare a further modification agreement to the existing promissory note.

> "We, in turn, will prepare, on behalf of [defendants] the respective commitments to Rolph B. Fuhrman and Fuhrman Development Co., Inc., *in effect guaranteeing Mr. Fuhrman's obligation* to pay the debt in accordance with its new terms.

> "* * * * *

> "* * *[T]he Boardman operation will retain all funds from property sales and to the extent the operation is not self-supporting, then Fuhrman will personally meet your new payment schedules — *to the extent he draws upon the commitment of [defendants] is his business*." (Emphasis supplied.)

Bank contends that the first emphasized portion of that letter evidences the intention of the parties that defendants would guarantee Fuhrman's obligation. Assuming that the letter expressed the parties' intentions, the second emphasized portion indicates that their commitments were to Fuhrman and that only he could draw on those commitments, negating any suggestion in the first emphasized portion that the commitments ran to Bank and were to be enforceable by it. In any event, the documents that were executed later contain the first clear indication of what the parties intended. Bank concedes that those documents are unambiguous, and

we conclude, as did the trial court, that they do not constitute a guarantee enforceable by Bank.

In a letter dated August 20, 1979, to Fuhrman and FDC, each defendant stated:

> "As you will note from the enclosed form of commitment, I have agreed to provide *to the Company* my commitment *to assist the Company* if necessary in paying a portion of its mortgage obligation to [Bank] with respect to the Boardman Project." (Emphasis supplied.)

In a separate letter of the same date from defendants to Fuhrman, defendants stated:

> "On the strength of this commitment * * * you have obtained a modification of the terms of repayment of the note indebtedness.
>
> "This letter will serve as *my commitment to the Company to pay to it* funds *upon call of the Company,* subject to the terms and conditions hereinbelow stated:
>
> "* * * * *
>
> "2.  *The Commitment:*
>
>> "If the Company does not at any time and for any reason pay the principal and/or interest on the note to [Bank] at the times, in the amounts and in the manner specified in the Modification Agreement, then *the undersigned hereby agrees to pay to Company* a sum equal in amount to one-third of any such principal and/or interest then due and payable under the Note as so modified, said payment to be made by the undersigned forthwith *upon receipt of written notice that Company is requesting payment* under this commitment." (Emphasis supplied.)

The documents required defendants to make payments to "the Company," meaning FDC, *on request of FDC.* As the trial court held, they did not guarantee FDC's obligation to Bank. They further provided:

> "[T]he undersigned hereby consents to the assignment and/or pledge of this commitment letter to Bank as further security for its entering into the Modification Agreement with Company."

Bank contends that that provision indicates an intention that

the commitments be assigned by FDC to Bank. That intention is further evidenced, Bank contends, by a corporate document entitled "Joint Action of Directors and Shareholders," wherein FDC recited the corporation's approval of the commitments from defendants and the loan modification agreement and further resolved that:

> "[A]ny single officer of the Company is hereby authorized to sign and to deliver The Oregon Bank Financing Documents whereupon said documents shall become valid and binding obligations of the Company, enforceable against it in accordance with the terms of said documents."

Even assuming that that resolution authorized FDC to assign defendants' commitments, there is no evidence that that authority was ever exercised. The trial court's finding that no assignment was ever made is supported by the evidence. We disagree with Bank that the commitments were, in effect, "self-assigning" by their terms. To the contrary, the fact that they expressly authorized an assignment indicates that the parties anticipated that some affirmative act was necessary to effectuate an assignment. That never occurred.

On December 13, 1979, and December 30, 1979, Bank notified defendants and Fuhrman that interest payments on the modified agreement were past due. Defendants paid those installments directly to Bank. Bank contends that the fact that defendants made those payments is further evidence of an intention to assign the commitments. Although we agree that the evidence would show that defendants had a motive for seeing that the Boardman loan not go into default, that motive was to avoid a default in the Makena loan. Those payments, alone, do not prove an assignment; they were self-serving.

Bank contends in the alternative that it is a third party beneficiary of the commitments. We reiterate, however, that the commitments were conditioned on FDC's requesting defendants to make payment to it. FDC never made such a request. Although, as Bank asserts, there is evidence that the commitments were made as consideration for Bank's modification of the Boardman loan, the trial court found that the consideration ran to FDC, not Bank. Bank had no direct right to enforce the commitments, either as an assignee or as a third party beneficiary. What it had was an incidental right to enjoy

the benefits of the commitments, if and when FDC chose to call on defendants to make payments to it. It never did.

In view of our holdings, we need not address the remaining assignments.

Affirmed.